PHILIP S. PIERCE,

        Plaintiff,

                                  Case No. 14-cv-214-pp

v.

CAROLYN W. COLVIN,

        Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS (DKT. NO. 12), AFFIRMING THE DECISION OF THE COMMISSIONER, AND DISMISSING APPEAL**

**I.    INTRODUCTION**

Plaintiff Philip S. Pierce seeks judicial review of a final decision of defendant Carolyn W. Colvin, the Acting Commissioner of Social Security, who found that he was not "disabled" within the meaning of the Social Security Act. The Social Security Administration's Appeals Council denied review, making the Administrative Law Judge's decision the final decision of the Commissioner. Pierce contends that the ALJ erred by making an erroneous adverse credibility determination, and that the ALJ's decision is not supported by substantial evidence. Pierce argues that this court should reverse the Commissioner's decision and award him benefits, or remand the case to the ALJ for further proceedings. For the reasons stated below, the court affirms the Commissioner's decision that Pierce is not entitled to Social Security disability benefits.

1

**II.    COMMISSIONER'S SEPTEMBER 5, 2014 MOTION TO DISMISS**

On May 6, 2014, Judge Randa (the judge assigned to this case at the time) issued the court's standard Social Security appeal briefing letter. Dkt. No. 11. That letter required, among other things, that plaintiff Pierce file his brief by August 6, 2014. Id. at 1.

No other pleadings appear on the docket until September 5, 2014—a month after the plaintiff's brief was due. On that date, the defendant filed a motion asking the court to dismiss the appeal because the plaintiff had not complied with the court's order requiring him to file a brief by August 6. Dkt. No. 12.

The court acknowledges that the plaintiff did not file a brief by the deadline set in Judge Randa's briefing letter. The docket reflects, however, that on April 16, 2014, the plaintiff's original attorney filed a motion to withdraw. Dkt. No. 8. Judge Randa granted that motion on April 30, 2014. Dkt. No. 10. Between the date that Judge Randa granted the motion to withdraw, and the date that the defendant filed the motion to dismiss, no attorney made a notice of appearance on behalf of the plaintiff. Three weeks *after* the defendant filed her motion to dismiss, however, the plaintiff's current attorney filed a notice of appearance, Dkt. No. 13, along with a motion asking the court to re-set the briefing schedule, Dkt. No. 14. In the motion, counsel stated that because the plaintiff had been unrepresented at the time his brief was due, he did not realize the importance of filing a brief. In addition, counsel had learned that the plaintiff recently had been released from the hospital after having been

2

committed under Wisconsin's Chapter 51. The plaintiff's brother had hired counsel, who had conferred with counsel for the defendant and had no objection to the court setting a new briefing schedule. Id. at 1.

Subsequently, counsel filed a motion for extension of time to file the plaintiff's brief, Dkt. No. 17, and Judge Randa granted that unopposed motion. Accordingly, the court will deny the defendant's September 5, 2014 motion to dismiss for failure to timely file a brief (Dkt. No. 12).

### III. STANDARD OF REVIEW

#### A. Judicial Review

When the Appeals Council denies a claimant's request review, the ALJ's decision constitutes the final decision of the Commissioner. Moore v. Colvin, 743 F.3d 1118, 1120 (7th Cir. 2014). Judicial review under 42 U.S.C. §405(g) is limited; the court will reverse only if the ALJ's decision is not supported by substantial evidence, is based on legal error, or is so poorly articulated as to prevent meaningful review. Hopgood ex rel. L.G. v. Astrue, 578 F.3d 696, 698 (7th Cir. 2009). "An ALJ's findings are supported by substantial evidence if the ALJ identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion." Id. (citation omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Barnett v. Barnhart, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). If conflicting evidence in the record would allow reasonable minds to disagree about whether the claimant is disabled, the

3

ALJ's decision to deny the application for benefits must be affirmed. Elder v. Astrue, 529 F.3d 408, 413 (7th Cir. 2008).

The court must review the entire record, including both the evidence that supports as well as evidence that detracts from the ALJ's conclusions, but it may not "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations." Simila v. Astrue, 573 F.3d 503, 513 (7th Cir. 2009). The ALJ's decision to deny benefits must be untainted by an erroneous credibility finding. Engstrand v. Colvin, 788 F.3d 655, 660 (7th Cir. 2015) (citation omitted). "An ALJ is in the best position to determine the credibility of witnesses," and the court will uphold his credibility determination unless it was patently wrong. Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). If the ALJ gives "specific reasons supported by the record" to explain a credibility determination, the court will not overturn that credibility determination unless it is "patently wrong." Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2013). "Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." Sims v. Barnhart, 442 F.3d 536, 538 (7th Cir. 2006). "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." Pierce v. Colvin, 739 F.3d 1046, 1051 (7th Cir. 2014).

In sum, the court will uphold a decision so long as the record reasonably supports it and the ALJ explains his or her analysis of the evidence with

enough detail and clarity to permit meaningful review. Eichstadt v. Astrue, 534 F.3d 663, 665–66 (7th Cir. 2008).

B.  Disability Determination

In evaluating a claim for disability benefits, the ALJ follows a five-step, sequential process, asking:

> (1) Has the claimant engaged in substantial gainful activity since his alleged onset of disability?
>
> (2) If not, does he suffer from a severe, medically determinable impairment?
>
> (3) If so, does that impairment meet or equal any impairment listed in SSA regulations as presumptively disabling?
>
> (4) If not, does he retain the residual functional capacity ("RFC") to perform his past work?
>
> (5) If not, can he perform other jobs existing in significant numbers?

E.g., Villano v. Astrue, 556 F.3d 558, 561 (7th Cir. 2009).

If it appears at any step that the claimant is or is not disabled, the analysis ends. 20 C.F.R. §404.1520(a)(4). "The claimant bears the burden of proof at steps one through four, after which at step five the burden shifts to the Commissioner." Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

## IV. DISCUSSION

Pierce was involved in a motor vehicle accident on February 13, 2010, which he alleges exacerbated his chronic depression and anxiety, and he stated the date of the onset of his disability as July 26, 2010. Dkt. No. 18 at 1-2. He

5

filed for disability benefits on August 13, 2010. Id. at 1. At the time of the accident, Pierce did not think he was injured, though he sought treatment from a chiropractor and a neurologist within several days. Dkt. No. 16-3 at 67-69. Pierce testified that he continued to work at his flooring business "on a somewhat regular basis" after his accident, trying to complete projects that already were underway. Id. at 49. He was able to do that until July 2010, and worked intermittently until April 2011. Id. at 47. Pierce testified that he stopped working because he was "making so many mistakes and causing so much trouble, [he] was unable to complete [his] jobs properly." Id. at 50. According to Pierce: "I was rear-ended and the next thing I knew I was having a hard time running my business. I couldn't think." Id. at 67. The "number one thing" that prevented Pierce from working was his "inability to focus." Id. at 50. He also testified that he had memory problems, severe anxiety, and a "very hard time with" understanding information and instructions. Id. at 50-51.

At step three of the sequential disability determination process, the ALJ decided that Pierce was not disabled because he did not have an impairment or combination of impairments that meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, App. 1 (20 C.F.R. §§404.1520(d), 404.1525, and 404.1526). Dkt. No. 16-3 at 14-15. Pierce's argument on appeal has two components: (1) the ALJ's credibility determination was flawed, and (2) the ALJ failed to correctly weigh the evidence in determining that Pierce was not disabled. See generally Dkt. No. 18 at 9-24.

A. Credibility Determination

Pierce argues that the ALJ "begins his decision with the premise that . . . Pierce is not credible." Id. at 11. According to Pierce, the ALJ's "premise . . . is not properly supported and instead is dependent on misinterpretation of the evidence." Id. Pierce contends that the ALJ's erroneous credibility determination made it "easy for the [ALJ] to discount the medical evidence because diagnoses are often based upon subjective complaints." Id. at 12. The court addresses these arguments in turn.

1. The ALJ's Credibility Determination Is Adequately Supported by the Record Evidence

Pierce contends that, when evaluating whether Pierce had engaged in substantial gainful activity after his alleged disability onset date, the ALJ misinterpreted two strands of evidence and testimony about Pierce's work history and medical records, and erroneously found that Pierce is not credible.

First, the ALJ referenced record evidence that shows Pierce "earned $20,000 in the fourth quarter of 2010." Dkt. No. 16-3 at 13. The ALJ averaged that figure over three months, and concluded that Pierce "committed disqualifying acts of substantial gainful activity for the fourth quarter of 2010" because the amount Pierce claimed to have earned in that quarter "indicated work activity in excess of substantial gainful activity amounts." Id. The ALJ also referenced record evidence and testimony that Pierce "last worked in April 2011 for his own hardwood flooring business." Id. The ALJ determined that Pierce's "work activity is inconsistent with [Pierce's] alleged onset date and

7

negatively affects the credibility of his subjective allegations regarding an inability to perform all work-related activities." Id.

Later in his decision, the ALJ referred to record evidence showing that Pierce "was capable of working at his former business," Dkt. No. 16-3 at 13, and to medical records that demonstrated his "successful ability to perform work-related activities but also reflect[] [his] express reluctance to jeopardize his receipt of private disability insurance benefits with too much work activity, along with the impact of work activity on financial demands from his ex-wife." Id. at 14. The ALJ found that "this evidence negatively erodes the credibility of [Pierce's] uncorroborated allegations of a disabling mental impairment, which prevents all work activity." Id.

        a.    *The ALJ's Interpretation of Pierce's Accounting Evidence is Reasonable.*

Pierce initially takes issue with the ALJ's interpretation of the evidence and testimony as it relates to his work history. First, he argues that the ALJ's decision "ignores the offer of proof from [Pierce's] attorney that states the income shows up in the fourth quarter because Mr. Pierce and his accountant show income for Mr. Pierce's business at the end of the year in the fourth quarter." Dkt. No. 18 at 11. Pierce claims that he tried to continue to work after July 2010, but could not do so "at a substantial gainful level," which Pierce says is consistent with his alleged disability onset date and not in conflict with the fact that he earned income in 2010. Id.

The ALJ's decision, however, shows that he considered Pierce's accounting explanation for his reported income for the fourth quarter of 2010.

8

The ALJ found that Pierce's explanation for his 2010 earnings of exactly $20,000 was called into question by his 2008 and 2009 earnings—also exactly $20,000. The ALJ found it odd that Pierce earned "exactly $20,000 for 2008, 2009, and 2010, while other evidence shows [he] had large gambling debts from mid-2010 through early 2011." Dkt. No. 16-3 at 26. The ALJ explained that "it is difficult to fully evaluate [Pierce's] work history due to the accounting practices he utilized." Id. The ALJ's decision shows that, notwithstanding Pierce's explanation that his accounting practices inaccurately suggested that he engaged in substantial gainful activity during the fourth quarter of 2010, other record evidence made it difficult for the ALJ to determine that Pierce's explanation was credible.

The ALJ noted that, under 20 C.F.R. §404.1529 and Social Security Ruling 96-7q, Pierce's work history must be considered in assessing his credibility. Id. The ALJ wrote that the "inconsistent information provided by [Pierce] may not be the result of a conscious intention to mislead, nevertheless, the inconsistencies suggest that the information provided by [Pierce] generally may not be reliable." Id. For that reason, the ALJ concluded that Pierce's "work history negatively affects his credibility and is not supportive of any disabling mental impairments." Id. The court finds the ALJ's determination is reasonable.

### b. *The ALJ Drew Reasonable Inferences Based on Pierce's Statements about his Ability to Work and Private Disability Benefits.*

Next, Pierce argues that, contrary to the ALJ's determination, he never denied "working in 2011. His statement was that his expenses exceeded his income. He has always maintained that after July of 2010, he tried to work but was not able to perform at a substantial gainful level." Dkt. No. 18 at 11. But the definition of "substantial gainful activity" expressly provides that profitability is not at issue—the activity simply must be of the type of work that is "usually done for pay or profit, *whether or not a profit is realized.*" 20 C.F.R. §404.1572(B) (emphasis added). Moreover, the ALJ is permitted to make reasonable inferences based on the record evidence. Stevenson v. Chater, 105 F.3d 1151, 1155 (7th Cir. 1997). In this case, the record reflects that Pierce's private disability benefits began in October 2010 and ended in October 2012. Dkt. No. 16-3 at 14. Dr. Rubin's medical records from June, 14, 2012, which the ALJ relied on in his decision, contain the following passage:

> We talked about whether he thought he was willing and able to resume some part time work again. He thought he was, but observes that he needed to talk with the people with whom he has an insurance policy covering this period of unemployment. He needs to understand what the impact of his resuming work will be and how quickly he'll lose his benefits.

Dkt. No. 16-13 at 13-14, 22. Based on this information, the ALJ inferred that Pierce was concerned that working too much could put his private disability payments at risk, despite the fact that Pierce did not explicitly state "that he did not want to work because it would affect his disability," as Pierce contends

in his brief. Dkt. No. 18 at 23. The court finds that the ALJ's inference was not unreasonable, nor was it unreasonable for the ALJ to find that this statement negatively affected Pierce's credibility.

Finally, the court notes that the ALJ wrote that Pierce's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." Dkt. No. 16-3 at 17-18. This is the "oft-criticized boilerplate language" described as "meaningless" by the Seventh Circuit. Murphy v. Colvin, 759 F.3d 811, 815 (7th Cir. 2014). In this case, however, even though the ALJ's written decision contains the boilerplate language, it elsewhere identifies specific evidence in the record that supports his credibility determination and articulates his reasons for discrediting Pierce's testimony. The ALJ's credibility decision is otherwise well supported and is not patently wrong. The ALJ found that the evidence conflicted with the level of symptoms and limitations Pierce claims to suffer. The ALJ further noted the lack of any evidence of record (aside from Pierce's own testimony and Dr. Spiro's reports, which the ALJ discounted) that supported the plaintiff's alleged symptoms and limitations. The court determines that the ALJ articulated a sound basis and good reasons for not giving weight to Pierce's allegation that he had disabling mental impairments.

11

### B. Weight Given to the Evidence

Pierce next argues that the ALJ erroneously determined that Pierce did not have a mental impairment or condition that meets or exceeds the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§404.1520(d), 404.1525, and 404.1526), known as "the Listings." Pierce contends the ALJ failed "to evaluate the medical evidence properly," and that "there is no contrary evidence in the record from examining physicians that would support a finding that Mr. Pierce is able to perform substantial gainful activity." Dkt No. 18 at 12,16.

The ALJ must evaluate every medical opinion in the record and decide what weight to give it, regardless of the source of the opinion. 20 C.F.R. §404.1527(c). The opinion of a treating source is entitled to controlling weight regarding the nature and severity of an impairment, provided it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(c)(2); SSR 96–2p. The ALJ may discount the opinion of a treating physician "if it is inconsistent with the opinion of a consulting physician . . . or when the treating physician's opinion is inconsistent with substantial evidence in the record;" the contradictory opinion of a non-examining physician is not sufficient by itself. Duncan v. U.S. R.R. Retirement Bd., 787 F.3d 400, 407 (7th Cir. 2015) (citing Gudgel v. Barnhart, 345 F.3d 467, 470 (7th Cir. 2003)).

12

"If an ALJ does not give a treating physician's opinion controlling weight, the regulations require the ALJ to consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed, and the consistency and supportability of the physician's opinion." Moss v. Astrue, 555 F.3d 556, 561 (7th Cir. 2009) (citing 20 C.F.R. §404.1527). Thus, if the ALJ determines that the opinion of a treating source is not entitled to controlling weight, the ALJ must consider whether it is still entitled to some level of deference using the factors set forth in 20 C.F.R. §404.1527. SSR 96–2p. If an ALJ rejects the treating source's opinion, he must provide a sound explanation for that decision. 20 C.F.R. §404.1527(d)(2); Punzio v. Astrue, 630 F.3d 704, 710 (7th Cir. 2011). An ALJ must offer "good reasons" for discounting the opinion of a treating physician and build a logical bridge from the evidence to his conclusion. Roddy v. Astrue, 705 F.3d 631, 636 (7th Cir. 2013); Martinez v. Astrue, 630 F.3d 693, 698 (7th Cir. 2011).

Here, the ALJ analyzed listings 12.04 (affect disorders) and 12.06 (anxiety disorders). Pierce argues that the ALJ erred by concluding that Pierce does not satisfy the criteria of affect disorders under 12.04.[1] Dkt. No. 18 at 14-16. Listing 12.04 is composed of three sets of criteria, which are set out in paragraphs (A), (B), and (C). 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04. Pierce needed to satisfy the paragraph (A) criteria and either the paragraph (B) or (C) criteria to establish a sufficiently severe impairment or combination of

---

[1] Pierce did not challenge the ALJ's finding that Pierce does not meet the criteria of listing 12.06.

13

impairments to fulfill his burden at step three. The ALJ considers the paragraph (A) criteria to substantiate whether the claimant has a particular medically determinable impairment. 20 C.F.R. Pt. 404, Subpt. P. App. 1, §12.04. The Commissioner does not dispute that Pierce meets the paragraph (A) criteria. Dkt. No. 23 at 5.

If the claimant has a severe impairment, the ALJ then considers whether the claimant meets the paragraph (B) or (C) criteria.[2] The ALJ uses the (B) criteria to determine the claimant's degree of functional limitation in four functional areas—activities of daily living; social functioning; maintaining concentration, persistence, or pace; and repeated episodes of decompensation of extended duration (three episodes within one year, or an average of once every four months, each lasting for at least two weeks). 20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.04. To meet the paragraph (B) criteria, Pierce needed to prove he that he had "marked" limitations in two or more of those four functional areas. Id. Pierce argues that he meets the paragraph (B) criteria, but the ALJ found that his limitations were not "marked." Dkt. No. 16-3 at 16.

Pierce relies entirely on the treatment records from Dr. Herzl Spiro, Pierce's psychiatrist, to argue that he meets the paragraph (B) criteria. Dkt. No. 18 at 16 ("Mr. Pierce satisfies the 'B criteria' based upon the conclusions of Dr. Spiro."). He maintains that Dr. Spiro's records establish that he has "marked limitations in maintaining social functioning, extreme difficulties in

---

[2] The ALJ uses the paragraph (C) criteria to determine the claimant's ability to function independently and/or handle changes in environment. The paragraph (C) criteria are not at issue; Pierce and the Commissioner dispute only whether Pierce meets the paragraph (B) criteria.

14

maintaining concentration, persistence or pace and has had four or more repeated episodes of decompensation." Id. at 16.

"The ALJ is not required to mechanically walk through all of the §1527(c) factors, but he must explain each factor that is material to his decision." Roningen v. Colvin, No. 13-cv0-550, 2014 WL 4926236 at *6 (W.D. Wis. Sept. 30, 2014). The ALJ thoroughly evaluated Dr. Spiro's records in detail, along with the remainder of the medical evidence. See Dkt. No. 16-3 at 18-27. He fully explained his conclusion that, "[w]hile the evidence shows Dr. Spiro has been regularly treating the claimant, his opinions are not entitled to controlling weight under SSR 96-02p, especially in light of the subjective nature of the global assessment of functioning scores, along with a lack of objective corroboration of [Pierce's] purported 'brain trauma'." Id. at 25 (internal citations omitted).

The ALJ gave the following reasons for discounting the opinion of Dr. Spiro:

> 1. Dr. Spiro's October 6, 2011 report "suggests the claimant's motor vehicle accident caused his alleged mental limitations," but "there is insufficient objective corroboration within the longitudinal medical evidence of record." Id. at 21.
>
> 2. "[T]he focus of Dr. Spiro's report centers on the claimant's motor vehicle accident as the causation for his alleged mental defects; however, when considered in light of the claimant's pending civil litigation, [his] findings are inherently suspect." Id.
>
> 3. Dr. Spiro's October 21, 2011 re-evaluation of the plaintiff "occurred in direct rebuttal to Dr. Anderson's report . . . which lessens its persuasive quality and

15

increases the likelihood that it was prepared in anticipation of litigation." Id. at 22.

4. Dr. Spiro's conclusion that the plaintiff's MRI provided objective evidence of a traumatic brain injury is not within his training, because he "is a psychiatrist, not a neurologist or radiologist, who would be trained to interpret diagnostic imaging reports." Id.

5. With regard to Dr. Spiro's administrative finding that the plaintiff was "unable to work," the ALJ explained that Dr. Spiro "did not rely upon any objective findings, beyond citing an uncorroborated concussive disorder which indicates that he chose to heavily rely upon the claimant's subjective allegations rather than acceptable clinical and diagnostic techniques, all of which show generally normal objective findings and significantly reduces the persuasive quality of the forms he completed, under SSR 96-02p." Id. at 25 (internal citation omitted).

6. Dr. Spiro's September 2012 opinion, which reflected his conclusion that Pierce had a significantly limited ability to function, was in "a 'check a box' format, which makes it less persuasive," and that the longitudinal medical evidence did not support Dr. Spiro's findings. Id.

The court concludes that the ALJ properly evaluated the record evidence and discounted Dr. Spiro's September 2012 opinion that Pierce had "marked" limitations in maintaining social functioning and "extreme" limitations in maintaining concentration, persistence or pace, and four or more episodes of decompensation. Id. at 21, 25. The ALJ acknowledged Dr. Spiro's treating relationship with the plaintiff, but reasoned that his opinions are either uncorroborated by or inconsistent with the longitudinal medical evidence and objective test results. Id. at 21-22, 25, 27. Specifically, the ALJ found that Dr. Spiro's opinion was not consistent with the findings reflected in Pierce's

16

diagnostic imaging reports and the medical records of several other providers who examined or treated Pierce after his accident.

The ALJ identified substantial diagnostic imaging and medical records indicating that Pierce did not suffer a brain injury. A July 2010 CT scan of Pierce's head was normal. Id. at 18. An October 2010 MRI of Pierce's brain showed no objective clinical findings of brain trauma. Id. A brain EEG conducted in January 2011 was normal. Id. Another MRI of Pierce's brain in April 2011 showed no evidence of acute pathology. Id. The ALJ concluded that the diagnostic reports "failed to correlate to any of [Pierce's] subjective allegations involving cognitive deficiencies . . ., which is inconsistent with a disabling impairment which precludes all work activity . . . ." Id. (internal citations omitted).

On appeal, Pierce argues that the "more reasonable diagnosis" is that his accident exacerbated his "chronic depression and anxiety" to the point that he became disabled, rather than caused a brain injury. Dkt. No. 18 at 2. Pierce sought treatment two days after his motor vehicle accident. He complained of mild pain in his neck and back, superficial injuries to his legs, and general achiness. Id. Neurologist Arthur J. Turner, M.D., examined Pierce in July 2010, and found that the accident did not cause any significant injury, but may have exacerbated his depression and anxiety. Id. Nonetheless, Dr. Turner found that Pierce was in a state of "overall well-being." Id.

After comparing Dr. Spiro's opinions with the rest of the medical evidence, the ALJ concluded that Dr. Spiro's opinions reflected "a strong

17

possibility of inappropriate bias or sympathy towards [Pierce] . . . and an overall lack of corroborating objective, diagnostic or clinical findings." Id. The ALJ correctly found that Dr. Spiro's opinion that Pierce's brain MRI showed evidence of a traumatic brain injury was inconsistent with the medical evidence, because the radiology report of that MRI drew no connection between the "mild" changes noted and Pierce's accident. Id. at 22; Dkt. No. 16-10 at 3. The ALJ noted that Dr. Debra Anderson examined Pierce in June 2011 at the request of Pierce's internist. Dr. Anderson found that it was "very unlikely" that Pierce had suffered a traumatic brain injury in his motor vehicle accident. She also noted that Pierce's memory was "excellent," that he did not have difficulty filling out the paperwork at her office, and that he gave conflicting answers about whether he had applied for disability benefits and whether he was suing the driver of the other vehicle involved in the accident.[3] Dkt. No. 16-10 at 17-18. The day after Dr. Anderson evaluated Pierce, he was evaluated by Michael I. Kula, a licensed psychologist. The ALJ noted that Dr. Kula's testing reflected "no evidence of any type of intellectual or cognitive deterioration or impairment." Dkt. No. 16-3 at 20. He also referenced May 2012 treatment records from Edward Rubin, Psy.D, reflecting that Pierce was doing "okay" or "doing well," and had progressed to the point at which he thought he was able to begin doing work in his former trade. Dkt. No. 16 at 22.

---

[3] Pierce argues that Dr. Anderson's report "was not complete" and suggests that the ALJ should not have relied on it. Dr. Anderson based her report on her interview of Pierce at the request of Pierce's internist. Pierce does not explain how this report is incomplete, and he does not develop this argument any further.

18

The ALJ considered in detail the length, nature, and extent of Pierce's treatment relationship with Dr. Spiro, the frequency with which Dr. Spiro examined Pierce, Dr. Spiro's specialty, the types of tests performed, and the consistency and supportability of Dr. Spiro's opinion that Pierce is disabled. Id. He found that Dr. Spiro's initial examination of Pierce, in August 2011, "demonstrated only mild memory deficits . . while showing [he] was fully oriented, remote memory was intact, concentration was good, thinking was logical and goal oriented, associations coherent, and no delusions or hallucinations were exhibited." Id. at 21. The ALJ found that Dr. Spiro's October 6, 2011 report, which "centers on [Pierce's] motor vehicle accident as the causation for his alleged mental defects," was suspect in light of Pierce's ongoing litigation. Id. He further found that Dr. Spiro's subsequent evaluation of Pierce on October 21, 2011 may have been in anticipation of litigation because it "occurred in direct rebuttal to Dr. Anderson's report". Id. at 21-22. Because Dr. Spiro was not a radiologist or neurologist, the ALJ found that his interpretation of Pierce's diagnostic imaging tests did not support Pierce's contention that he suffered a brain injury. He further found that there was no medical evidence consistent with Dr. Spiro's conclusion that Pierce had a disabling mental limitation. Id. at 22. The ALJ adequately addressed the §1527(c) factors that were material to his decision to discount certain of Dr. Spiro's opinions that Pierce suffered a brain injury and that his motor vehicle accident caused mental limitations and/or defects. Id. at 21.

19

Despite the plaintiff's argument to the contrary, the ALJ identified substantial medical evidence and testimony that was inconsistent with Dr. Spiro's opinion that Pierce had "marked" and "severe" limitations. Accordingly, the ALJ did not err in declining to give Dr. Spiro's opinion controlling weight. After reviewing the record evidence and testimony, the court cannot find that the ALJ's conclusions were patently wrong. The court concludes that the ALJ's decisions that Pierce's functional limitations did not meet the paragraph (B) criteria of Listing 12.04, and that he is not disabled, are supported by substantial evidence.

**V. CONCLUSION**

The court **DENIES** the defendant's September 5, 2014 motion to dismiss for failure to timely file the plaintiff's brief. (Dkt. No. 12)

The court **ORDERS** that the decision of Carolyn W. Colvin, Acting Commissioner of Social Security, denying Pierce's application for disability benefits is **AFFIRMED**, and **DISMISSES** Pierce's appeal. The clerk of court will enter judgment in favor of the defendant and close the case.

Dated in Milwaukee this 30th day of September, 2015.

BY THE COURT:

_____
HON. PAMELA PEPPER
United States District Judge